**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
**AVIV CITRON,**

<table>
<tr><td style="text-align:center">Plaintiff,</td><td>20 Civ.</td></tr>
<tr><td style="text-align:center">-against-</td><td><u>COMPLAINT</u></td></tr>
<tr><td><b>NATIONAL RAILROAD PASSENGER CORP.,</b></td><td><b>JURY TRIAL DEMANDED</b></td></tr>
<tr><td style="text-align:center">Defendant.</td><td></td></tr>
</table>

------------------------------------------------------------------X


## INTRODUCTION

1.      Pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51, *et. seq.* ("FELA"), Defendant National Railroad Passenger Corporation d/b/a Amtrak is exempt from workers' compensation laws, which means that it is liable to its employees whose injuries are caused by its negligence and that it therefore has a financial incentive to discourage employees' from reporting injuries, blame them for whatever injuries they do report, and manufacture a pre-textual reason to terminate those who it cannot blame. Because railroads, including Amtrak, have a long history of acting on this motive, Congress amended the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"), adding new prohibitions against railroads, providing employees a private right of action in federal court, and relaxing the standards of proof for retaliation claims. *See*, *e.g.*, The Implementing Recommendations of the 9/11 Comm. Act of 2007, P. L. 110-53, 121 Stat. 444 (Aug. 3, 2007). Despite this amendment, Amtrak has continued to use the above-referenced tactics to minimize the amount it must pay to its employees whose injuries are caused by its negligence.

2.      On March 9, 2017, Amtrak's negligence injured one of its police officers, Plaintiff Aviv Citron. Between surgeries for that injury, Citron tried to return to service, albeit on light duty. The day after Citron went on leave for his second surgery, knowing it was liable for the time he would be off, Amtrak manufactured a reason to terminate him.

## PARTIES

3.      Citron worked as a police officer for Amtrak from 2010 to the incident at issue in this case.

4.      Amtrak, which is headquartered in Washington D.C., provides rail transportation services across the United States, including in this district.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

6.      This Court has personal jurisdiction over Amtrak because Amtrak maintains a significant business presence within this district, and Amtrak's acts and omissions giving rise to Citron's claim occurred in this district.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Citron's claims occurred in this district.

## FACTUAL BACKGROUND FOR CITRON'S FELA CLAIM

8.      In 2010, Amtrak hired Citron as a police officer.

9.      Citron worked for Amtrak in this district.

10.     On March 9, 2017, Citron reported to work in this district, where he was ordered to investigate an issue with trespassers at Amtrak's Sunnyside Yard.

11.     Amtrak's order necessitated Citron descending a metal ladder attached to a concrete wall.

12.     The bottom of the ladder was covered with overgrown vegetation.

13.     Amtrak knew or should have known that it would be dangerous for Citron to use the ladder in the Sunnyside Yard.

14.     The overgrown vegetation obscured Citron's view.

15.     Citron's obscured view contributed to him slipping and falling.

16.     Citron's slip and fall contributed to him injuring his knee.

17.     Citron reported his injury to Amtrak in this district.

18.     Citron's knee injury has necessitated surgical intervention.

19.     Citron's body used a compensation pattern to perform motions because of his injured knee.

20.     Citron's compensation pattern resulted in him injuring his other knee.

21.     Citron's other knee injury has necessitated surgical intervention.

**FACTUAL BACKGROUND FOR CITRON'S FRSA CLAIM**

22.     In 2015 or 2016, Citron bought into a gym business.

23.     Before buying in, Citron asked Amtrak whether he needed its permission to co-own a business.

24.     Amtrak told Citron that he needed its permission to work for another employer but not to own a business.

25.     While off from work for the injury he suffered when he slipped and fell from the ladder, Citron opened a security business.

26.     The security company Citron owns provided security to, among other places, Citron's synagogue.

27.     Because Citron only owned the security company and did not work for it, he was not required to disclose his ownership of it to Amtrak.

28.     After his first but before his second surgery for his knee injury, on April 13, 2018, Citron's doctor returned him to work with restrictions.

29.     While on light duty, Citron put in a request to volunteer at his synagogue in a manner that was within any medical restrictions preventing him from working full-duty.

30.     Amtrak denied Citron's request, telling him that it would not allow an employee on light duty to volunteer elsewhere.

31.     Amtrak had no basis to prohibit Citron from volunteering at his house of worship other than he happened to be on light duty due to his work-related injury.

32.     After Amtrak denied his request, Citron learned that it was illegal for Amtrak to prohibit him from volunteering at his synagogue.

33.     The day after Citron went out of service to have a second surgery for his injury, knowing that it would be liable to him for the time his surgery would cause him to miss work, Amtrak manufactured a reason to terminate him, namely Citron having supposedly worked for his company.

34.     On the day at issue, Citron, in fact, had not been working for his company and instead was merely volunteering at his synagogue, as it was his right to do.

35.     When it terminated him, Amtrak knew or should have known that Citron had not, in fact, been working for his company and had instead been volunteering for his synagogue.

36.     The termination decision was made in this district.

37.     The termination decision was made pursuant to policies enacted in this district.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE FELA

38.     The FELA provides that Amtrak is "liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U.S.C. § 51.

39.     On March 9, 2017, Amtrak negligently failed to furnish and provide Citron a reasonably safe place to work, reasonably safe conditions for work, reasonably safe appliances for work, reasonably safe equipment for work, and/or reasonably safe methods of work.

40.     Amtrak's negligence injured Citron's knees.

41.     The injuries and damages sustained by Citron were caused, in whole or in part, by Amtrak's negligence, in violation of the FELA, when Amtrak failed to provide Citron with a reasonably safe place to work, which caused Citron to suffer severe, permanent, and painful injuries to his knees and his body as a whole.

42.     The above-described acts and omissions of Amtrak include Amtrak's violation of one or more safety rules, regulations and statutes, including Amtrak's own rules, which constitute strict liability against Amtrak.

43.     On account of said injuries, Citron has undergone extensive medical care and treatment and

will be required to seek medical treatment in the future. Even with such treatment, the strength, use, and function of Citron's knees, related body as a whole, and general health and strength have been permanently weakened, diminished, and impaired. As a result, in addition to the physical pain, mental anguish, and lost capacity for the enjoyment of life he has and will continue to suffer, Citron has lost and will continue to lose earnings, and has incurred and will continue to incur expenses for medical treatment.

## COUNT II
## VIOLATIONS OF THE FRSA

44.     The FRSA prohibits railroads from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "notify[ing], or attempt[ing] to notify, the railroad carrier . . . of a work-related personal injury . . . ." 49 U.S.C. § 20109(a)(4). The FRSA also prohibits railroads disciplining or threatening a discipline to employee for following orders or a treatment plan of a treating physician. 49 U.S.C. § 20109(c)(2).

45.     Citron engaged in protected activity reporting his injury and trying to return to work pursuant to his doctor's restrictions.

46.     Amtrak knew Citron had engaged in protected activity when it denied his request to volunteer at his synagogue and when it terminated him.

47.     Amtrak took adverse actions against Citron when it denied his request to volunteer at his synagogue and when it terminated him.

48.     Citron's protected activity was a contributing factor in Amtrak's decision to deny his request to volunteer at his synagogue and to terminate him. In fact, the denial and termination resulted directly from his protected activity.

## REQUEST FOR RELIEF

49.     Citron requests that the Court find Amtrak acted in direct violation of the FELA and FRSA.

50.     Citron further requests that the Court order Amtrak to:

- reinstate him;

- clear and/or expunge any record of misconduct by him regarding the incidents described herein;

- pay to him an award for compensatory damages arising from loss of income and benefits in an amount to be determined by the trier of fact;

- pay to him an award for compensatory damages arising from loss of earning capacity in an amount to be determined by the trier of fact;

- pay to him an award for emotional distress;

- pay to him an award for pain and suffering;

- pay to him an award for past and future medical expenses;

- pay to him an award for costs (including litigation and expert costs), disbursements, and attorneys' fees;

- pay to him an award for $250,000 for punitive damages for each violation of the FRSA; and

- pay to him an award for liquidated damages in an amount equal to his wage and benefit loss.

51.     Citron further requests that the Court order judgment against Amtrak for all other relief available under the FELA and/or FRSA, as well as all such other relief as the Court deems just and equitable.

Respectfully submitted

By: _____
            MARC WIETZKE
FLYNN & WIETZKE, PC
1205 Franklin Avenue
Garden City, NY 11530
Tel.: (516) 877-1234
E-mail: MWietzke@felaattorney.com


Nicholas D. Thompson (motion for admission *pro hac vice* forthcoming).
THE MOODY LAW FIRM, INC.
500 Crawford Street, Suite 200
Portsmouth, Virginia  23704
Phone: 757-393-4093
Email: nthompson@moodyrrlaw.com